IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-00345-FL

| | |
|---|---|
| **Verdell Yvonne Richardson,**<br><br>                     Plaintiff,<br><br>v.<br><br>**Carolyn Colvin**, Acting Commissioner of Social Security,<br><br>                     Defendant. | **Memorandum & Recommendation** |

      Plaintiff Verdell Yvonne Richardson instituted this action on July 22, 2015, to challenge the denial of her application for social security income. Richardson claims that Administrative Law Judge Richard E. Perlowski erred in his determination by failing to find that her impairments met Listing 11.14 (peripheral neuropathies) and by failing to properly weigh the medical opinions. Both Richardson and Defendant Carolyn Colvin, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 32, 34.

      After reviewing the parties' arguments, the court has determined that ALJ Perlowski reached the appropriate decision. There is substantial evidence to support his finding that Richardson failed to demonstrate that she met the criteria of Listing 11.14. Additionally, the court cannot conclude that ALJ Perlowski erred in considering the medical opinion evidence. Therefore, the undersigned magistrate judge recommends that the court deny Richardson's

Motion for Judgment on the Pleadings, grant Colvin's Motion for Judgment on the Pleadings, and affirm the Commissioner's determination.[1]

## I. Background

On August 3, 2010, Richardson filed an application for supplemental security income. On September 2, 2010, she filed an application for disability insurance benefits. Both applications alleged a disability that began on May 1, 2010. After her claims were denied, she filed an action in this court. Upon the agreement of the parties, this court remanded the matter for further consideration. Thereafter, Richardson appeared before ALJ Perlowski for a hearing to determine whether she was entitled to benefits. After the hearing, ALJ Perlowski determined Richardson was not entitled to benefits because she was not disabled. Tr. at 444–62.

ALJ Perlowski found that Richardson had the following severe impairments: neuropathy, asthma, chronic obstructive pulmonary disease ("COPD"), obstructive sleep apnea, and polyarthralgias. *Id*. at 447. ALJ Perlowski also found that these impairments, alone or in combination, did not meet or equal a Listing impairment. *Id.* at 448. ALJ Perlowski then determined that Richardson had the residual functional capacity ("RFC") to perform light work with the following limitations: she is limited to occasional climbing, balancing, handling, and fingering; she is unable to perform constant pulling or pushing with the upper extremities; and she is precluded from having concentrated exposure to pulmonary irritants and hazards. *Id*. at 449. ALJ Perlowski also concluded that Richardson was unable to perform any past relevant work but that considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she was capable of performing. *Id*. at

---

[1] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

460–61. These include counter clerk, furniture rental consultant, and usher. *Id.* at 461. Thus, ALJ Perlowski found that Richardson was not disabled. *Id.* at 462.

Richardson then commenced this action by filing a complaint pursuant to 42 U.S.C. § 405(g) on July 22, 2015. D.E. 6.

**II.     Analysis**

    **A.     Standard for Review of the Acting Commissioner's Final Decision**

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

    **B.     Standard for Evaluating Disability**

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is

3

equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses the claimant's RFC to determine, at step four, whether he can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Medical Background

Richardson has a history of arm and leg pain with attendant numbness beginning in May 2010. She sought treatment in the Emergency Department of Johnson Memorial Hospital ("JMH"), where she received a diagnosis of polyarthralgia, and providers prescribed pain medication. Tr. at 257–60. She sought treatment for similar symptoms later in May 2010 and again in August 2010. *Id*. at 257–64. In September 2010, Richardson saw Dr. Marilyn Pearson at the Johnston County Health Department ("JCHD") complaining of numbness in her hands and feet. Examination notes indicate that she had a steady gait but reduced muscle strength. *Id*. at 346. Dr. Pearson diagnosed muscle weakness with a skin sensation disturbance. *Id*. at 349.

Richardson returned to JCHD in October 2010 where examination noted decreased muscle strength in her upper extremities and weakness in her lower extremities. *Id*. at 332. Providers diagnosed her with multiple joint pains and weakness. *Id.* at 333. Richardson thereafter sought treatment at the University of North Carolina for evaluation of her hand and foot pain as well as her elevated rheumatoid factor. Dr. Beth Jonas noted that Richardson reported she had trouble tying her shoes, she was unsteady on her feet, but she had not fallen. *Id*. at 243. Dr. Jonas found impaired vibratory sense and was unable to elicit deep tendon reflexes but noted pinprick

4

sensation and motor strength were intact. *Id*. at 244. Dr. Jonas believed Richardson's symptoms were more consistent with neuropathy than rheumatoid arthritis. *Id*.

Richardson continued to experience hand pain, for which she sought treatment from the Emergency Department of JMH in January 2011. *Id*. at 311–15. She returned to JCHD in February 2011 for pain in her hands and feet. Treatment notes reflect that she had decreased grip strength, reduced reflexes, and an unsteady gait. *Id*. at 335–36. Providers referred Richardson to Dr. W.G. Ferrell at Raleigh Neurology for her hand pain and weakness. Dr. Ferrell's examination noted decreased sensation in her fingers and toes, decreased motor strength, and an unsteady gait. *Id*. at 372–73. He diagnosed neuropathy that was possibly diabetic in origin. *Id*. A nerve conduction study ("NCS") later that month noted evidence of profound sensory neuropathy. *Id.* at 329. The NCS also noted that the right and left ulnar motor responses were slow around the elbows and that there was evidence of mild ulnar mononeuropathy. *Id*.[2]

Richardson received follow-up care from Amy Gonzales, a nurse practitioner. In March 2011, Richardson reported continued numbness, tingling, and burning in her extremities, as well as gait issues. *Id*. at 377. Gonzales diagnosed peripheral neuropathy and ulnar neuropathy, for which she prescribed medications. *Id*. at 377–80. Gonzales again assessed Richardson with peripheral neuropathy when she presented in June 2011 with complaints of numbness and tingling in her extremities. *Id*. at 405–08. Due to the peripheral neuropathy, Gonzales opined that Richardson could not ambulate effectively, that she could stand for 15 minutes and sit for 60 minutes, and that she could lift no weight. *Id*. at 344–45. She also determined that Richardson could not perform fine or gross manipulations. *Id*.

---

[2] The NCS may be inconsistent inasmuch as the Summary notes normal sensory responses yet the Interpretation concludes there are marked abnormalities with evidence of profound sensory neuropathy. Tr. at 329.

Richardson returned to JCHD in August 2011 for discomfort, which was attributed to neuropathy. *Id*. at 394. She saw Gonzales again in October 2011 for continued numbness. *Id*. at 415. Richardson reported that she tried to walk for exercise but that she had problems with balance and a heavy feeling in her legs. *Id*. Motor and sensory exams were normal and peripheral neuropathy was again assessed. *Id*. at 416–17. A subsequent examination by Gonzales in April 2012 noted continued numbness and some imbalance. *Id*. at 693–95. Motor and sensory exams were again normal and peripheral neuropathy was diagnosed. *Id*.

Richardson's subsequent loss of insurance limited her ability to obtain medical care. *Id*. at 743–44. In March 2014, Richardson had a consultative examination with Dr. Peter Morris. *Id*. at 748–51. He reported that she had a slow, antalgic gait, could not squat or kneel, and that she almost fell doing the heel walk. *Id*. He also reported that she was able to get on and off the examination table without assistance. *Id*. Dr. Morris noted that Richardson had almost full strength in her extremities but also had decreased sensation from her elbows to her hands and from her knees to her feet. *Id*. He opined that she would have severe limitations with walking, lifting, carrying, reaching, handling, feeling, and grasping; that she would have great difficulty with postural maneuvers such as bending, stooping, crouching, and squatting; that she would have no limitation in sitting; and that she did not need an assistive device to ambulate. *Id.*

North Carolina approved Richardson for Medicaid coverage in April 2014. *Id*. at 627. The approval found that she was limited to sedentary work, that she had a diagnosis of peripheral neuropathy, and that her reported limitations were consistent with the objective medical evidence which noted decreased sensation, difficulty using her hands, and difficulty walking. *Id*.

Richardson went to JCHD in September 2014 at which time she reported continued pain from peripheral neuropathy which she likened to frostbite hands. *Id*. at 768. She also reported

that she walked 15 minutes per day for exercise. *Id*. Although her sensation was not tested, Richardson had symmetric reflexes and an intact gait. *Id*. at 768–69.

Richardson re-established care with Gonzales in September 2014, at which time she reported some relief of her symptoms with medication but continuing pain in her hands and feet. *Id*. at 762. Gonzales recommended physical therapy as she had an unsteady gait. *Id*. at 766. Gonzales issued an opinion on Richardson's condition on September 29, 2014. *Id*. at 758–60. She remarked on Richardson's gait abnormalities and her poor prognosis for recovery. *Id*. at 758. Gonzales opined that Richardson could walk one block; she could sit and stand for 15 minutes at a time for up to two hours per day; she could rarely lift less than 10 pounds; she could rarely use her hands for reaching and never use them for manipulations; and she would require breaks for fatigue, pain, and weakness. *Id*. at 759–60.

Dr. Bruce G. Witkind, a non-examining medical expert in neurology, issued an assessment of Richardson's condition on December 4, 2014. *Id*. at 809–11. He opined that Richardson's subjective complaints were not consistent with the objective findings. *Id*. at 809. He also found that she had mild peripheral neuropathy without weakness or atrophy, that she had no limitations in walking, standing, sitting, or manipulating objects. *Id.* He further opined that she did not meet any of the Listings and that she was limited to light to medium work. *Id*.

### D. Listing 11.14

Richardson first argues that ALJ Perlowski erred by failing to find that her peripheral neuropathy satisfied the criteria of Listing 11.14. The Commissioner maintains, and the court agrees, that substantial evidence supports ALJ Perlowski's finding that Listing 11.14 is not met.

The "Listing of Impairments" details impairments that are "severe enough to prevent an individual from doing any gainful activity." 20 C.F.R. § 416.925(a). If a claimant's impairments

7

meet all the criteria of a particular listing, 20 C.F.R. § 416.925(c)(3), or are medically equivalent to a listing, *id.* § 416.926, this alone establishes that the claimant is disabled. *Id.* § 416.920(d). "The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard [for disability more generally]. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *see also Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (stating that the listings are designed to weed out only those claimants "whose medical impairments are so severe that it is likely they would be disabled regardless of their vocational background").

The claimant has the burden of demonstrating that his or her impairments meet or medically equal a listed impairment. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981); *see also Hancock v. Astrue*, 667 F.3d 470, 476 (4th Cir. 2012). As such, a claimant must present medical findings equal in severity to all the criteria for that listing: "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530–31; *see also* 20 C.F.R. § 416.925(c)(3). The regulations provide:

> Can your impairment(s) meet a listing based only on a diagnosis? No. Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis. To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing.

20 C.F.R. § 416.925(d); *see also Mecimore v. Astrue*, No. 5:10–CV–64, 2010 WL 7281096, at *5 (W.D.N.C. Dec. 10, 2010) ("Diagnosis of a particular condition or recognition of certain symptoms do not establish disability.").

An ALJ is not required to explicitly identify and discuss every possible Listing; rather, he is compelled to provide a coherent basis for his step three determination, particularly where the "medical record includes a fair amount of evidence" that a claimant's impairment meets a

disability listing. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Where such evidence exists but is rejected without discussion, "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Id.* (citing *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). In reviewing the ALJ's analysis, it is possible that even "[a] cursory explanation" at step three may prove "satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Meador v. Colvin*, No. 7:13–CV–214, 2015 WL 1477894, at *3 (W.D. Va. Mar. 27, 2015) (citing *Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011)). Nevertheless, the ALJ's decision must include "a sufficient discussion of the evidence and explanation of its reasoning such that meaningful judicial review is possible." *Id.*

Section 11.00 of the Listings address neurological conditions in adults. 20 C.F.R. Pt. 404, Subpart P., App'x 1 § 11.00. Listing 11.14 (peripheral neuropathies) requires "disorganization of motor function as described in 11.04B, in spite of prescribed treatment." 20 C.F.R. Pt. 404, Subpart P., App'x 1 § 11.14. Under Listing 11.04B, a claimant must show "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." 20 C.F.R. Pt. 404, Subpart P., App'x 1 § 11.04B. In turn, the preamble to the 11.00 Listings provides:

> C. Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands and arms.

9

20 C.F.R. Pt. 404, Subpart P., App'x 1 § 11.00C. To establish a disability under Listing 11.14, Richardson must demonstrate: (1) disorganization in motor function; (2) in two extremities; (3) resulting in sustained disturbance of: (a) gross and dexterous movements; or (b) gait and station; and (4) the disorganized motor function is persistent or sustained, in spite of treatment.

Richardson contends that the medical evidence demonstrates a disorganization in motor function in two extremities in spite of treatment. She also asserts ALJ Perlowski erred by stating that there was no motor component to her neuropathy. Richardson submits that a sensory disturbance due to peripheral neuropathy can satisfy the requirements of Listing 11.14. She asserts that the record demonstrates disturbance in the use of her hands and feet due to such sensory loss.

In support of this argument, Richardson points to the following evidence: in 2011, Gonzales noted that she could not do gross or dexterous movements with her hands because of significant peripheral neuropathy; Dr. Jones noted her sensory perception was markedly affected by neuropathy; JCHD records noted Richardson had an unsteady gait and reduced reflexes and strength; Dr. Ferrell noted that she essentially had no function in her hands, impaired motor function, unsteady gait, and poor balance; and the NCS found profound sensory neuropathy in both hands. She also points to her testimony where she stated that she had injuries to her hands and arms that she could not feel; she cannot type, button shirts, open a bottle, or pick up coins; she can only walk for a few minutes; and she can no longer drive. Richardson submits that testing demonstrated loss of sensation in all of her extremities, and that her gait abnormalities were observed by both Gonzales and Dr. Morris.

There is no doubt that the record shows some sensory loss, gait abnormalities, imbalance, and loss of proprioception accompanying Richardson's complaints of extremity weakness,

10

numbness, and pain. However, the Commissioner points out that these abnormalities reflect symptom exacerbation which largely occurred in the brief time period between her onset date and beginning treatment in February 2011. As ALJ Perlowski noted, since she started treatment in February 2011, Richardson's conditions overall have been responsive to treatment to a sufficient degree to that she is able to perform work-related activity. *Id.* at 456. She reported medication helped her symptoms, she did not pursue physical therapy as recommended, and her treatment has been limited in frequency and type which suggests her condition is not as limiting as she alleges.

ALJ Perlowski considered the evidence Richardson cites in support of her argument. As explained more fully below, this evidence was not given controlling weight and therefore is not fully reliable in establishing her impairments. The medical evidence generally demonstrates improvement after she began to receive treatment. ALJ Perlowski noted that, once treatment commenced in February 2011, Richardson reported that medication relieved her pain and symptoms in March 2011 and again in June 2011, (*id.* at 405, 452); in June 2011, she had fair ability to walk and to balance, and did not report any falls, (*id.*); she had normal gait and station, and only slightly reduced strength and sensory findings in June 2011 (*id.* at 424, 452); Richardson's October 2011 neurological exam was normal, (*id.* at 416–17, 452–53); in March 2014, Dr. Morris noted she could ambulate, get on and off the examination table, and put on her shoes without assistance, (*id.* at 453, 750–51); ER records from April 2014 and July 2014 note a steady, independent gait, (*id.* at 453, 785, 99); although she complained of severe limitations in September 2014, except for her gait, examination showed normal results, (*id.* at 454, 762–66); and although she had an abnormal Romberg sign in February 2011, the Romberg sign was normal in June 2011 and again in April 2012, (*id.* at 322, 407, 456, 695).

11

Case 5:15-cv-00345-FL   Document 39   Filed 06/23/16   Page 11 of 19

While Richardson points out that she had an abnormal gait, several of these records predate her treatment. In contrast, the record as a whole reflects that, once treatment began in February 2011, Richardson had a normal gait in October 2011, April 2012, and September 2014. Tr. at 417, 695, 764. Moreover, although the October 2011 treatment record notes difficulty walking, this appears to be her subjective complaint, as the same record states that her gait was normal. *Id*. at 415, 417. In April 2012, she went to the ER where she was noted to be at risk of falling, but after the assessment was completed, the ER deemed her as not being at high risk for falls. *Id.* at 720. Records from September 2014 reflect that Richardson had difficulty performing the testing but also found that her gait and station were normal. *Id*. at 750–51, 764.

In sum, because the abnormal findings she references occurred, in large part, prior to her beginning treatment, and the record reflects her symptoms improved or stabilized after she began treatment, she cannot establish "disorganization of motor function . . . *in spite of prescribed treatment*" as required under Listing 11.14 (emphasis added). Thus, even assuming that she has sensory loss or disturbance and that it was to the degree necessary to satisfy the preamble requirements for the 11.00 Listings, Richardson is unable to establish, and the record does not demonstrate, that this loss or disturbance continued despite treatment. For this reason, Richardson has not established that she meets the criteria of Listing 11.14.[3]

### E. Medical Opinion Evidence

Richardson next asserts that ALJ Perlowski erred in giving more weight to the opinion of a non-examining expert over the opinions of her treating provider and a consultative examiner.

---

[3] The Commissioner also challenges whether Richardson has established the "sustained disturbance of motor function" required by 11.14. Multiple exams noted normal gait and station, and normal neurological exam findings. Additionally, Dr. Witkind's opined that there was no indication that any disturbance in gross or dexterous movements was sustained and there a disturbance in station was not shown. However, given that the court has concluded that Richardson failed to carry her burden of showing a disturbance "in spite of treatment," it need not decide whether any disturbance was also "sustained."

The Commissioner maintains that ALJ Perlowski properly considered the medical opinion evidence and explained the weight he afforded to it. The court finds that ALJ Perlowski did not err in weighing these medical opinions.

The ALJ must weigh and evaluate all medical opinions received, regardless of the source. 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, opinions of treating sources are given greater weight than opinions of non-treating sources, such as consultative examiners. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). While a treating source's opinion usually is afforded "great weight," the ALJ is not required to afford it "controlling weight." *Craig*, 76 F.3d at 589–90. "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Id.* at 590. If the ALJ determines a treating source's opinion should not be given controlling weight, then the ALJ must evaluate and weigh the opinion according to the following non-exclusive list: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527). The ALJ must state the weight given to a treating source's medical opinion and provide specific reasons for the weight given to those opinions. SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996).

### 1. Gonzales

Richardson asserts that the opinion of Gonzales, her treating provider, deserved more weight. Gonzales opined that Richardson could not ambulate effectively, that she was limited in her ability to sit, and that she could not lift any weight or manipulate any objects. Tr. at 457–58.

ALJ Perlowski noted that Gonzales, a nurse practitioner, is not an acceptable medical source but also noted that she had a treating relationship with Richardson. *Id.* at 457. He further determined that the functional limitations Gonzales assessed were not supported by the contemporaneous treatment records that noted mostly mild findings. *Id*. ALJ Perlowski concluded that some of Gonzales's assessments of Richardson were unsupported and unexplained by her treatment notes. *Id*. at 458. ALJ Perlowski further remarked on Richardson's improved condition after February 2011. *Id*. For these reasons, ALJ Perlowski gave little weight to Gonzales's opinions. *Id*.

Substantial evidence supports ALJ Perlowski's consideration of Gonzales's opinion. As noted above, most of the testing and examinations occurring after Richardson began treatment reflect normal or near-normal findings. Despite Richardson's argument to the contrary, ALJ Perlowski noted three occasions where testing or examinations indicated her reduced strength and impaired sensory findings after treatment commenced. *Id*. at 452. However, the limitations assessed by Gonzales lacked support in mild findings reflected in the record. ALJ Perlowski noted, for example, although Gonzales found Richardson was severely limited in her ability to walk, treatment notes reflect that she had a normal gait. *Id*. at 457.

Finding Gonzales's opinion failed to reflect the period after Richardson began treatment, ALJ Perlowski properly concluded that it did not reflect an accurate assessment of her current, improved condition. *Id*. at 458. ALJ Perlowski considered Gozales's opinion, determined it was entitled to little weight, and supported this assessment with appropriate citations. Finding no error, the court declines Richardson's invitation to reweigh this evidence.

### 2. Morris

Richardson also contends that ALJ Perlowski should have given more weight to the opinion of consulting examiner, Dr. Morris. She maintains that Dr. Morris noted several abnormal findings during his March 2014 examination. As ALJ Perlowski discussed, Dr. Morris noted that Richardson had a slow and antalgic gait, she had difficulty with the heel walk, squatting, and kneeling, and she could not open a bottle nor pick up a paper clip. Tr. at 453. He also noted that Dr. Morris found reduced motor strength and sensation in the extremities. *Id*.

Dr. Morris opined that Richardson would have moderate difficulty in standing and severe difficulty in walking, lifting, carrying, reaching, handling, fingering, and grasping. *Id*. ALJ Perlowski gave this opinion some weight. *Id*. at 469. In doing so, ALJ Perlowski noted that Dr. Morris was a one-time examiner. *Id*. He further remarked that Dr. Morris did not express his opinion in vocationally relevant terms, which limited the utility of the opinion in determining Richardson's RFC. *Id*. ALJ Perlowski found that Dr. Morris's assessment that Richardson had no restriction in sitting was consistent with the record. *Id*. However, his assessed restrictions on lifting, carrying, reaching, and handling were not consistent with his mild examination findings. *Id*. Specifically, his examination found that Richardson had slightly reduced motor strength and slightly decreased range of motion in her extremities. *Id*. ALJ Perlowski also noted that Dr. Morris's findings of imbalance and antalgic gait was inconsistent with other findings in the record which showed normal gait and station. *Id*. at 460.

Given Dr. Morris's limited treatment relationship with Richardson and the fact that his findings were, in part, inconsistent with both his own examination findings as well as the other evidence in the record, ALJ Perlowski appropriately assigned only some weight to his

15

assessment. Because the court finds that Richardson has shown only disagreement, not error, in the consideration of Dr. Morris's opinion, her argument on this issue should be rejected.

### 3. Witkind

Finally, Richardson argues that ALJ Perlowski erred in considering Dr. Witkind's opinion. Richardson challenges Dr. Witkind's finding of mild peripheral neuropathy, asserting that the NCS documented marked abnormalities and profound sensory neuropathy. She contends that Dr. Witkind's determined that she had no limitations in her exertional abilities, premised on his finding that her examination records were within normal limits. Richardson submits this conclusion was erroneous inasmuch as several treatment records noted abnormal findings, including neurological deficits and sensory loss.

In considering this opinion, ALJ Perlowski noted that Dr. Witkind is a board-certified neurological surgeon who was appointed as a medical expert by the Social Security Administration in 2000. *Id*. at 459. ALJ Perlowski determined that Dr. Witkind's findings that Richardson has mild peripheral neuropathy and is capable of light work were consistent with the medical evidence demonstrating normal or mild objective findings. *Id*. Dr. Witkind also opined that Richardson may be capable of medium work as well and that she had no limitations in walking, sitting, standing, or manipulating objects. However, ALJ Perlowski found that the record supported more limitations in these areas that Dr. Witkind assessed. *Id*. For example, although Dr. Witkind concluded Richardson's only environmental limitation was to avoid extreme cold, ALJ Perlowski's RFC determination included a limitation that she avoid pulmonary irritants or hazards. *Id.* at 449. This would likely address Richardson's restrictions attributable to her asthma and COPD. Thus, ALJ Perlowski gave moderate weight to Dr. Witkind's opinion. *Id*.

16

Substantial evidence supports ALJ Perlowski's assessment. As noted above, the record showed abnormal examination findings, but the majority of these predated Richardson commencing treatment in February 2011. Since that time, her exams and testing have noted normal or mild findings. Dr. Witkind's characterization of the evidence is correct in this respect.

Additionally, the NCS to which Richardson cites appears to have inconsistent findings. *Id.* at 329. Although the the Summary notes normal sensory responses, the Interpretation concludes there are marked abnormalities with evidence of profound sensory neuropathy. *Id.* at 329. More specifically, the NCS found "[t]he right median, ulnar, radial, sural, and superficial peroneal sensory responses were normal . . . The right median, peroneal, and tibial motor responses were normal." *Id.* In then states that "[t]his study is markedly abnormal, with electrophysiologic evidence of profound sensory neuropathy." *Id.* Given the apparent conflict, it is questionable whether the results of the NCS support Richardson's argument. Moreover, the NCS was conducted at the time she commended treatment in February 2011. *Id.* Given the positive response to treatment, the NCS may not accurately address Richardson's improved condition since that time or demonstrate the degree of impairment she claims.

Finally, ALJ Perlowski's determination that Richardson did not meet Listing 11.14 is supported by evidence in the record noting objective neurological examinations within normal limits. *Id.* at 449. Additionally, the records showed multiple instances of normal gait and station and lacked any evidence of a sustained disturbance in dexterous or gross movements. *Id.* Dr. Witkind's conclusion that Richardson's impairments did not meet the Listing criteria thus supports ALJ Perlowski's findings at step three.

A review of his decision demonstrates that ALJ Perlowski considered all the medical evidence, weighed each medical opinion, and provided the reasons for the weight assigned. *Id.* at

457–60. Richardson has failed to show that ALJ Perlowski erred in evaluating the medical opinion evidence. Accordingly, her argument on this issue lacks merit.

**III.    Conclusion**

For the forgoing reasons, the court recommends that Richardson's Motion for Judgment on the Pleadings (D.E. 32) be denied, that Colvin's Motion for Judgment on the Pleadings (D.E. 34) be granted, and that the Commissioner's final decision be affirmed.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel.  Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation.  The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the**

**Memorandum and Recommendation.** *See Owen v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

Dated: June 23, 2016

                                            */s/ Robert T. Numbers II*
                                            ROBERT T. NUMBERS, II
                                            UNITED STATES MAGISTRATE JUDGE